# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:24-cv-00115-GCM

JOSEPH WAYNE RIDDLE,           )
                                      )
          **Plaintiff,**        )
                                       )       <u>**MEMORANDUM OF**</u>
**vs.**                                  )       <u>**DECISION AND ORDER**</u>
                                       )
**C.J. WILSON, et al.,**        )
                                       )
          **Defendants.**    )
_____  )

**THIS MATTER** is before the Court on Plaintiff's "Dispositive Motion In Matter" [Doc. 43], which the Court construes as Plaintiff's Motion for Summary Judgment, and Defendants' Motion for Summary Judgment [Doc. 48].

## I.    BACKGROUND

Pro se Plaintiff Joseph Wayne Riddle ("Plaintiff") is a prisoner of the State of North Carolina currently incarcerated at the Foothills Correctional Institution in Morganton, North Carolina. On April 17, 2024, he filed this action by unverified Complaint pursuant to 42 U.S.C. § 1983 against Defendants C.J. Wilson, identified as a Yancey County Sheriff's Deputy; Mark Geouge, identified as a Yancey County Jail Administrator; William Smith, identified as a "Jailer;" Michael Robinson, identified as a Jail Lieutenant; and Levi Johnson, identified as a Jail Lieutenant and former Sergeant, for events he alleged occurred incident to his arrest on September 23, 2023, and during his subsequent detention at the Yancey County Jail (the "Jail") in Burnsville, North Carolina. [Doc. 1 at 2-5, 7].

In pertinent part, Plaintiff alleged as follows. On September 23, 2023, Defendant Wilson, in the course of searching Plaintiff in front of a busy public store, repeatedly groped and fondled

Plaintiff's genitals. Plaintiff told him several times that he had no drugs or contraband. [Doc. 1 at 5]. Later that same day at the Jail, Plaintiff filed a PREA[1] complaint, presumably regarding Defendant Wilson's alleged conduct. [Id.]. Defendant Johnson was either partially or completely in charge of the grievance process at that time. [Id. at 7]. Still later that day, Defendant Johnson removed Plaintiff from his cell and "forcibly caused [him] to enter a confined space away from witnesses," where he attempted to intimate Plaintiff "verbally and nonverbally" into rescinding his grievance.[2] [Id. at 8]. Since then, Plaintiff has not felt safe to appeal any grievance. [Id.].

Plaintiff's Fourth Amendment claim against Defendant Wilson based on Wilson's alleged sexual assault of Plaintiff during Wilson's search and seizure of Plaintiff and Plaintiff's First Amendment claim against Defendant Johnson based on Johnson's alleged retaliation for Plaintiff's related grievance survived initial review. [Doc. 9]. Plaintiff's remaining claims, along with Defendants Geouge, Smith, and Robinson, were dismissed for Plaintiff's failure to state a claim for relief. [Id.]. Defendants Johnson and Wilson answered Plaintiff's Complaint [Doc. 12] and the Court entered its Pretrial Order and Case Management Plan, which set the discovery deadline as November 20, 2024 [Doc. 13].

On September 3, 2024, the Court granted Plaintiff's motion for leave to amend and supplement his Complaint and conducted initial review of Plaintiff's unverified, proposed amended Complaint. [Docs. 17, 18; see Doc. 20]. In his amended Complaint, Plaintiff again

---

[1] The PREA, or Prison Rape Elimination Act, 34 U.S.C. § 30301, seeks to establish "zero tolerance" for the incidence of prison rape. The purpose of this Act is to protect inmates in correctional facilities from sexual abuse and sexual assault. Gadeson v. Reynolds, No. 2:08-3702-CMC-RSC, 2009 WL 4572872, at *3 (D.S.C. Dec. 4, 2009).

[2] Oddly, these allegations against Defendant Johnson were written in a different handwriting and slip-sheeted into the Complaint. [See Doc. 1 at 8].

2

alleged that Defendant Wilson sexually assaulted him while conducting a search incident to Plaintiff's arrest on September 23, 2023. [Doc. 20 at 3, 4-5]. Plaintiff elaborated that, after Defendant Wilson conducted an initial "'Terry Pat'" of the handcuffed Plaintiff, Wilson searched Plaintiff's vehicle. Plaintiff further alleged that after searching the vehicle Plaintiff patted the Plaintiff down three more times and repeatedly "grabbed" Plaintiff's genitals despite Plaintiff stating, "stop grabbing my dick." [Id. at 5]. Plaintiff also warned Defendant Wilson that he would file a PREA complaint regarding the assault. [Id.]. After his arrest, Plaintiff was brought to the Yancey County Jail in a patrol car. [Id. at 6]. The next day, Defendant Johnson brought Plaintiff from his unit to a room in booking where there were no cameras or witnesses. [Id. at 6-7]. Defendant Johnson aggressively, while "[p]acing the room [with] balled first [and] gritting teeth," told the Plaintiff to recant his statement "or else." [Id.]. Plaintiff "stood firm" and maintained that he wanted his complaint investigated. Defendant Johnson was enraged, but said he would nonetheless send it the Burnsville Police Department. [Id. at 7].

Plaintiff also supplemented his Complaint with the following allegations. On May 1, 2024, Defendant Geouge, through a veiled interaction regarding a sledgehammer he was holding, threatened Plaintiff after Plaintiff filed the Complaint in this action. [Id. at 9-10]. On May 23, 2024, Defendant Geouge, accompanied by "corrections staff" York and Revis and Patrol Officer Ronnie Tipton, entered Plaintiff's cell. [Id. at 10]. "Without provocation, the Defendant began macing the Plaintiff, who was camly [sic] laying on his bunk. The Defendant started yelling that the Plaintiff had charged at him. The Plaintiff had not moved from his … bunk because of fear of what might happen, yet he … was maced two more times." [Id. at 10-11]. After being maced, Plaintiff was handcuffed and paraded around the Day Room while the officers screamed, "this is what we do to people who think they are Pod Bosses." [Id. at 11]. Plaintiff alleged that

3

Defendants Johnson's and Geouge's conduct "represent[s] a pattern of events demonstrating intentional retaliation against the Plaintiff … for filing grievances and a civil rights action." [Id. at 9-11, 15]. Plaintiff claims to have suffered mental and emotional distress due to the alleged incidents. [See Doc. 20 at 13-15]. Plaintiff seeks monetary relief only. [Id. at 15].

Based on these allegations, Plaintiff's First Amendment retaliation claims against Defendants Johnson and Geouge, his Fourth Amendment and sexual assault and battery claims against Defendant Wilson based on the alleged unreasonable search incident to arrest, and his Fourteenth Amendment excessive force claim against Defendant Geouge passed initial review. [Doc. 18]. The Court dismissed all remaining claims, as well as the allegations directed at individuals not named as a Defendants. [Id. at 7-8].

On April 25, 2025, Plaintiff moved for summary judgment.[3] [Doc. 43]. With his motion, Plaintiff submitted his discovery request on Defendant Wilson and Wilson's response; Defendants' Amended and Supplemental Responses to Plaintiff's "Requests for Admission;" the Consent Protective Order in this matter, and copy of the Court's Order at Docket No. 39 in which the Court addressed Plaintiff's "Request for Subpoena" [Doc. 38]; Plaintiff's letter to

---

[3] At this time, Plaintiff also filed a second motion to compel "production of the requested evidence" [Doc. 44; see Doc. 26], along with a purported "Notice of Subpoena Request" and proposed Subpoena directed to N.C. Highway Patrol Trooper Sampson Collier [Docs. 45, 45-1], which the Court addressed by Order [Doc. 51]. Of note, Plaintiff also included a sworn statement with these materials in which he states under penalty of perjury that "allegations [he] stated" in his Complaint "initiated … on 4-17-24 … are true." [Doc. 44-3 at 1; id. at 2 ("The allegations I've stated in my Complaint [are] true.")]. In his motion for summary judgment, Plaintiff again complains about the availability and production of certain video footage and other discovery and asks the Court for one "last extension period" to obtain "discoverable evidence." [See Doc. 43 at 5]. The Court has already addressed the discovery disputes in this matter, including Plaintiff's requests for video footage, and will not rehash those issues here or reopen discovery. [See Docs. 32, 35, 39, 51]. To the extent Plaintiff seeks further relief relative to any discovery matters in this motion or otherwise, these requests are denied as untimely and for the reasons previously stated by the Court. [See id.].

4

defense counsel dated March 6, 2025, regarding video footage and the Consent Protective Order; and a copy of Plaintiff's grievance regarding the alleged sexual assault, which is dated September 27, 2023, together with related statements and responses.[4] [Doc. 43-1]. The Court also received on Plaintiff's behalf a flash drive containing video footage of the September 23, 2023 arrest, which was produced by Defendants in discovery and transmitted to the Court by Foothills Correctional Institution Unit Manager Marc Dunn after Plaintiff viewed the footage on April 15, 2025. [Doc. 42[5]; Doc. 51 at 3].

On April 29, 2025, Defendants moved for summary judgment. [Doc. 48]. In support of their motion, Defendants submitted a Memorandum; the Affidavits of Defendants Wilson, Johnson, and Geouge; and the same grievances records submitted by Plaintiff. [Doc. 49, 49-1 through 49-3]. Defendants argue that they are entitled to summary judgment because Plaintiff's claims fail as a matter of law. [Doc. 49 at 1-10]. Defendant Wilson also argues that he is entitled to public official immunity on Plaintiff's state law assault and battery claim. [Id. at 7-8]. Before the Court's Roseboro Order issued, Plaintiff submitted an unverified "Reply" [Doc. 50] to Defendants' motion, which notably asserts allegations materially different from those in Plaintiff's Complaints and/or his subsequently filed Declaration as addressed infra.[6] [See Doc. 52]. Plaintiff also submitted copies of the Use of Force Report related to the May 23, 2024

---

[4] Plaintiff purported to label his Exhibits A though J. Exhibits B through D, however, were not included with his materials. [See Doc. 43-1; 4/25/2025 (Court Only) Docket Entry].

[5] The Court will herein reference this video footage as Docket No. 42.

[6] This filing also reiterates Plaintiff's unsubstantiated claims of editing or altering video footage in this matter, which the Court has already addressed. [Doc. 50 at 2-3, 6-7; Doc. 51 at 4-5].

5

incident and copies Defendants' Memorandum and Affidavits marked with his commentary.
[Doc. 50-1].

On May 12, 2025, the Court entered an Order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising the Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 51 at 6-8]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 7]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 8 (citing Fed. R. Civ. P. 56(c)(4))]. Thereafter, Plaintiff filed a Declaration in opposition to Defendants' motion.[7] [Doc. 52]. With this Declaration, he submitted an Incident/Investigation Report regarding Plaintiff's arrest, Defendants' Responses to Plaintiff's

---

[7] Plaintiff swore to the truth of the allegations set forth in pages one through seven of his Declaration, which was plainly written in someone's else handwriting, but did not sign the Declaration until page nine. [See Doc. 52 at 7, 9]. The Court will nonetheless give the Plaintiff the benefit of having submitted the first seven pages of the Declaration under penalty of perjury and, therefore, contributing to the forecast of evidence here.

First Requests for Admission, and a Disciplinary Report from the May 23, 2024, incident.[8] [Doc. 52-1]. Defendants replied. [Doc. 53].

As such, the forecast of evidence here consists of Plaintiff's Complaint, which he later verified, Defendants' Affidavits and discovery responses, the Plaintiff's Declaration, the grievance records and statements, the various reports, and video footage of the incident previously submitted on Plaintiff's behalf. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge").

These matters are ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

---

[8] Plaintiff also enclosed a purported Subpoena directed to the Jail and the Yancey County Sheriff's Department. [See Doc. 52-2].

7

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the

> record, so that no reasonable jury could believe it, a court should
> not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

Scott, 550 U.S. at 380.  To be sure, "at the summary judgment stage, video evidence can only discredit a nonmovant's factual assertions if the video 'blatantly' contradicts the nonmovant's position." Simmons v. Whitaker, 106 F.4th 379, 385 (4th Cir. 2024) (citing Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008)).

Moreover, the existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand summary judgment.  Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020).  As such, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of evidence offered to create a question of fact must be adequate…." Thompson Everett, Inc. v. Nat'l Cable Adver., 57 F.3d 1317, 1323 (4th Cir. 1995) (citing Anderson, 477 U.S. at 252).  In this regard, neither inadmissible hearsay nor conclusory statements without specific evidentiary support may be considered on a motion for summary judgment.  Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991); Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998).  The nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  Moreover, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citation omitted).

## III.    FACTUAL BACKGROUND

9

The forecast of evidence, viewed in the light most favorable to the Plaintiff as the non-moving party, shows the following.[9]

On or before September 23, 2023, Plaintiff agreed through Facebook Messenger to sell a large quantity of methamphetamine at the Price's Creek General Store (the "General Store") in Burnsville, North Carolina. [Doc. 49-1 at ¶ 4: Wilson Aff.; Doc. 52 at 2: Riddle Dec.]. Defendant Wilson, a Detective with the Yancey County Sheriff's Office, learned of this sale through an investigation of the sale and distribution of drugs in Yancey County. [Doc. 49-1 at ¶ 4]. At 12:13 p.m., Plaintiff arrived at the General Store, parking his car near and parallel to the street. [Doc. 42]. About a minute later, an unmarked vehicle pulled up and parked directly facing Plaintiff's car. Defendant Wilson immediately exited the unmarked vehicle from the passenger door and approached the driver's side door of Plaintiff's car. [Id.]. Another officer exited the driver's side with his gun drawn. [Id.]. Meanwhile, Defendant Wilson identified himself as a police officer, assisted Plaintiff out of his vehicle, and placed the Plaintiff under arrest. [Doc. 49-1 at ¶ 5; Doc. 42]. Plaintiff had been smoking a marijuana cigarette, which he surrendered to Defendant Wilson. [Doc. 52 at 2]. Incident to Plaintiff's arrest, Defendant Wilson conducted a brief pat down search of Plaintiff's outer clothing. [Doc. 49-1 at ¶ 6; Doc. 42]. Plaintiff surrendered the contents of his pockets and, at 12:16 p.m., was led to stand near the passenger side of the unmarked vehicle. [Doc. 52 at 2; Doc. 42]. Shortly thereafter, Defendant Wilson began searching Plaintiff's vehicle. At 12:41:05 p.m., after the vehicle search was complete and before Defendant Wilson placed the Plaintiff into a patrol car, Defendant Wilson conducted a second search of the Plaintiff, who was positioned against the rear back

---

[9] In this forecast, the Court addresses the material inconsistencies in Plaintiff's own allegations, assertions, and/or evidence here.

10

passenger side of his vehicle.[10]  The search, which also included a pat down of Plaintiff's legs and a search of the inside top of Plaintiff's unlaced boots, as well as seven-second pause in the search by Defendant Wilson, lasted less than 30 seconds.  Plaintiff had no discernible reaction to the search, which was conducted swiftly and calmly, and Defendant Wilson did not linger at any time in a manner consistent with the repeated groping and fondling of Plaintiff's genitals, as alleged.[11]  [Doc. 42].  Defendant Wilson attests that any contact he may have had with Plaintiff's genitalia would have been fleeting and as part of the pat-down search conducted pursuant to Wilson's training.  [Doc. 49-1 at ¶ 7].  After the search, Defendant Wilson led Plaintiff to a nearby patrol car.  [Doc. 42].  Plaintiff appeared calm and subdued from the time he was assisted from his car by Defendant Wilson to the time he was placed in the patrol car and brought to the Jail.[12]  [Id.; Doc. 49-1 at ¶ 8].

On Plaintiff's arrival at the Jail, he complained of an alleged sexual assault during his arrest.  [Doc. 49-2 at ¶ 6: Johnson Dec.].  He was given a grievance form, which he completed and submitted to a lieutenant on staff.  [Id. at ¶ 7].  Although Plaintiff alleged in his Complaint having submitted the grievance on September 23, 2023, the grievance record shows that he

---

[10] The view of Plaintiff in the video footage is partially obstructed because Plaintiff was positioned behind the rear passenger door and the doors to Plaintiff's vehicle remained open at this time.  [Doc. 42].

[11] In direct conflict with the video footage, Plaintiff alleges that Defendant Wilson searched Plaintiff a total of four times and that Defendant Wilson conducted "an invasive search" and repeatedly groped and fondled Plaintiff's genitals.  [Doc. 52 at 2; Doc. 1 at 5; Doc. 20 at 5].  Plaintiff further claims that Defendant Wilson was "clearly … aggressively … search[ing]" the Plaintiff for the "large quantity of narcotics" and that Plaintiff exclaimed several times during the search "let go of my dick" and "stop grabbing my balls."  [Doc. 52 at 3].

[12] Plaintiff was charged with Felony Possession of Methamphetamine, Felony Possession with Intent to Manufacture, Sell, or Deliver a Schedule II Controlled Substance, Felony Possession of a Schedule I Controlled Substance, Felony Conspiracy to Traffic Methamphetamine, Felony Conspiracy to Sell Methamphetamine, and Possession of Marijuana and Drug Paraphernalia.  [Doc. 49-1 at ¶ 8].

submitted his grievance, in which he asks that "a PREA be initiated," on September 27, 2023. [Doc. 49-2 at 6]. After the grievance moved through the chain of command, Defendant Johnson received it to investigate. [Doc. 49-2 at ¶¶ 3-4, 7; Doc. 1 at 7]. Because the grievance related to the patrol division, Defendant Johnson submitted it there. [Doc. 49-2 at ¶ 8]. If a grievance relates to a particular individual, Defendant Johnson requests a statement from the individual. [Id. at ¶ 4]. Defendant Johnson never received a response to the grievance from the patrol division and did not provide Plaintiff a response to the grievance. [Id. at ¶ 8; Doc. 1 at 7].

In his Complaint, Plaintiff alleged that, on or about September 23, 2023, Defendant Johnson removed Plaintiff from his cell and forced him to enter "a confined space away from witnesses" in response to his grievance. [Doc. 1 at 8]. After pleading with Plaintiff to rescind his PREA allegations, Defendant Johnson attempted to intimidate and coerce Plaintiff into dropping his PREA complaint.[13] [Id.; Doc. 52 at 4]. After that incident, Plaintiff did not feel safe to appeal any grievance. [Doc. 1 at 8]. Plaintiff was detained at the Jail until October 6, 2023, when he was transferred to the McDowell County Jail for six days. [Doc. 49-3 at ¶ 4: Geouge Dec.]. On October 12, 2023, he was returned to the Jail, where he remained until November 16, 2023, when he was released. [Id.]. Defendant Johnson believed that Plaintiff's grievance was mooted by his release from custody. [Doc. 49-2 at ¶ 10].

On or about January 6, 2024, Plaintiff was involved in a domestic disturbance. Defendant Wilson was sent to respond, "another illegal search ensued," and Plaintiff was arrested and returned to the Jail. [Doc. 52 at 5; Doc. 49-3 at ¶ 5]. On Plaintiff's filing of this lawsuit, Defendant Johnson restarted the internal investigation into the Plaintiff's grievance.

---

[13] Defendant Johnson attests that he never spoke to the Plaintiff regarding his grievance or encouraged him to withdraw it. [Doc. 49-2 at ¶ 9].

12

[Doc. 49-2 at ¶ 11]. As part of the investigation, Defendant Johnson asked Defendant Wilson to provide a statement regarding the alleged incident, which he did on April 9, 2024.[14] [Id. at ¶ 12; Doc. 49-2 at 8]. Defendant Johnson also reviewed video footage of Defendant Wilson's search of the Plaintiff, which Johnson found was conducted according to Defendant Wilson's training. [Doc. 49-2 at ¶ 12]. On or around April 8, 2024, Plaintiff was "threatened by a sledgehammer weilding [*sic*]" Defendant Geouge "consistent with the … reopening of [the] PREA investigation" on Defendant Wilson.[15] [See Doc. 52 at 5-6]. In his discovery request to the Defendants, however, Plaintiff stated that the sledgehammer incident occurred on May 1, 2024. [See Doc. 43-1 at 2].

On or about May 23, 2024, Officer Revis told another inmate to move to Plaintiff's cell. Plaintiff was angry and claimed, "I am the pod boss and you have to ask permission to move someone in here." [Doc. 50-1 at 27]. When Officer Revis told the Plaintiff that the Jail makes the rules, Plaintiff stood up aggressively and started to approach Revis. Officer Revis pushed the Plaintiff inside the cell and secured the door. [Id.; Doc. 52 at 5]. Officer Revis then went to control to call for assistance and notified Defendant Geouge that Plaintiff was being disruptive and kicking his cell door. [Doc. 50-1 at 27].

About two or three minutes later, while Plaintiff was lying on his bunk obviously agitated, the cell door opened, and Defendant Geouge entered with three other officers. Plaintiff

---

[14] Plaintiff failed to date his Complaint in this matter. [Doc. 1 at 16]. It was postmarked on April 16, 2024, and received by the Court the next day. [Doc. 1-4]. The Court presumes, consistent with the forecast of evidence, that Defendants were aware of Plaintiff's Complaint before it was technically filed.

[15] Defendant Geouge attests that on one occasion he carried a sledgehammer that had been used by an inmate work crew into the control room for return to its proper place. On his way to the control room, he carried the sledgehammer from the area where inmates are housed, but he never entered the block or threatened the Plaintiff with the sledgehammer. [Doc. 49-3 at ¶ 10].

13

"sat up, touched the floor with his feet, stood up," and advanced aggressively toward Geouge, who sprayed Plaintiff in the face "without warning." [Doc. 52 at 5; Doc. 50-1 at 27]. After being sprayed, Plaintiff was directed to sit down on his bed, which he did. Because his eyes and throat were burning from the pepper spray, however, Plaintiff stood up again to "blindly" find the sink to rinse his eyes.[16] When he stood up, he felt and heard a second burst of pepper spray hit his face.[17] [Doc. 52 at 6]. Plaintiff then complied with a direct order to sit on his bunk. [Id.; Doc. 50-1 at 27]. Plaintiff was handcuffed by Officer York [Doc. 50-1 at 27; Doc. 52 at 6] and then paraded around the block by Defendant Geouge and the three other officers, as Defendant Geouge announced, "This is what happens to pod bosses." [Doc. 52 at 6]. Plaintiff was escorted to the A-block shower area to decontaminate at approximately 8:22 a.m. [Doc. 50-1 at 27]. Plaintiff believes this use of force "can clearly be interpreted as a continuation of the incident" where Defendant Geouge wielded a sledgehammer "near the A-block entrance." [Doc. 52 at 6].

During his time at the Jail, Plaintiff was repeatedly recalcitrant and defied orders of officers. Force in the form of mace was used on the Plaintiff when necessary to control him. [Doc. 49-3 at ¶ 6]. Contrary to Plaintiff's forecast of evidence, Defendant Geouge attests that any forced used on the Plaintiff was in response to his behavior at the Jail, not his lawsuit or grievances. [Id.]. On June 28, 2024, Plaintiff was transferred to the McDowell County Jail for housing. [Id. at ¶ 5].

## IV. DISCUSSION

### A. Search Incident to Arrest

---

[16] According to the Use of Force Report, Plaintiff seemingly complied with the order to sit on his bunk, but then "immediately stood up and advanced towards" Defendant Geouge again. [Doc. 50-1 at 27].

[17] Contrary to the allegations of his Amended Complaint, Plaintiff now admits that he was only sprayed twice during this incident. [See Doc. 50 at 5; Doc. 20 at 10-11].

14

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." U.S. Const. amend. IV. "Therefore, to be constitutional, a search must not be unreasonable." Amaechi v. West, 237 F.3d 356, 360 (4th Cir. 2001). In Bell v. Wolfish, "the Supreme Court established an analytical framework for determining the reasonableness of a sexually intrusive search." Amachi, 237 F.3d at 361 (citing 441 U.S. 520, 559, 99 S.Ct. 1861 (1979)). "In Bell, the Supreme Court held that a reasonableness inquiry requires a court to balance the need for the particular search against the invasion of the personal rights that the search entailed." Id. (citing Bell, 441 U.S. at 559). "This balancing requires a court to conduct a contextual analysis to determine reasonableness by analyzing 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" Id. (quoting Bell, 441 U.S. at 559).

The forecast of evidence here shows that, after Plaintiff was arrested and before he was placed in a patrol car for transport to the Jail, Defendant Wilson conducted a pat down search of the Plaintiff that lasted less than 30 seconds. The forecast of evidence further shows that Defendant Wilson conducted the search calmly and swiftly, that Plaintiff remained calm and subdued before, during, and after the search, that Plaintiff did not appear to exclaim or have any discernible reaction to the search, that no action by Defendant Wilson appeared consistent with any prolonged or repeated contact with Plaintiff's genital region, and that Plaintiff was calmly lead to the patrol car after the search. From this forecast of evidence, no reasonable jury could conclude that Defendant Wilson violated Plaintiff's rights under the Fourth Amendment based on an unreasonable search incident to arrest. Rather, a reasonable juror would conclude that any contact with Plaintiff's genitalia was fleeting and incidental to an appropriately conducted

15

search.  The Court, therefore, will grant Defendants' motion on this claim.

B.     **Excessive Force**

The Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment."  Graham v. Connor, 490 U.S. 386, 395 n.10 (1989).  To state an excessive force claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable."  Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015).  The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one."  Id.   In Kingsley, the Supreme Court set forth several factors in assessing whether an officer's use of force was reasonable:

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. (citing Graham v. Connor, 490 U.S. 386, 395, 396 (1989)). In assessing whether Defendant used excessive force, this Court must make that determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id.  Additionally, the Court must "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.' " Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540, 547 (1979)).

The forecast of evidence here shows that Plaintiff became angry when Officer Revis told another inmate to move to Plaintiff's cell; that after Plaintiff stood up aggressively and

16

approached Revis, Revis pushed Plaintiff back into his cell, called for assistance, and told Defendant Geouge that Plaintiff was kicking his cell door and being disruptive; that after two or three minutes and while Plaintiff was lying on his bunk agitated, Defendant Geouge entered Plaintiff's cell with three other officers; that Plaintiff stood up and advanced aggressively toward Defendant Geouge, and that Defendant Geouge administered a single burst of pepper spray to Plaintiff's facial area; that although Plaintiff initially complied with Geouge's order to return to his bed, Plaintiff stood up again and Defendant Geouge administered a second short burst of pepper spray; and finally that Plaintiff then complied with Defendant Geouge's order to sit on his bed. From this forecast of evidence, no reasonable juror could conclude that the force use on Plaintiff was objectively unreasonable from the perspective of a reasonable officer on the scene. Rather, a reasonable juror would conclude that Defendant Geouge's minimal use of force was a reasonable response to Plaintiff's aggressive behavior and apparent refusal to follow Defendant Geouge's direct orders. Moreover, Plaintiff has forecast no evidence of injury suffered from the use of force. The Court, therefore, will grant Defendants' motion on this claim and dismiss it.

To be sure, the Plaintiff's Amended Complaint passed initial review on this claim because Plaintiff alleged that the use of force was unprovoked and that he remained calmly on his bed for the duration of this incident. Plaintiff, however, has since admitted that he did, in fact, leave his bed before he was sprayed the first time, that he failed to abide Defendant Geouge's order to remain on his bed before he was sprayed a second time, that he was only sprayed twice not three times, and that the entire incident was preceded by and interspersed with Plaintiff's aggressive, noncompliant behavior. Had Plaintiff truthfully alleged the facts surrounding this use of force in the first instance, the Court would have dismissed this claim against Defendant Geouge on initial review. Furthermore, the entire record before the Court

17

reflects that Plaintiff has changed his story on this claim as this litigation has progressed. As such, the Court would not choose one of Plaintiff's conflicting versions of the facts to overcome summary judgment here in any event. See Barwick, 736 F.2d at 960.

## C.    Retaliation

An inmate has a clearly established First Amendment right to be free from retaliation for filing grievances. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 540 (4th Cir. 2017). Inmates also have a protected First Amendment right to complain to prison officials about prison conditions and improper treatment by prison employees that affect them. See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

"The elements of a retaliation claim are: (1) that the plaintiff engaged in protected activity; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) that the adverse action was motivated, at least in part, by the plaintiff's protected conduct." Wade v. Ballard, No. 2:13-cv-12817, 2016 WL 3693597, at *4 (S.D.W. Va. June 16, 2016) (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

Regarding Plaintiff's retaliation claim against Defendant Johnson, the forecast of evidence shows that Defendant Johnson removed Plaintiff from his cell the same day Plaintiff arrived at the Jail to intimate and coerce Plaintiff into dropping a grievance that was not filed until days later and did not reach Defendant Johnson in the chain of command until even later. From this forecast, no reasonable juror could conclude that any adverse action by Defendant Johnson was motivated by Plaintiff's protected conduct which had not yet occurred. The Court, therefore, will also grant Defendants' motion as to this claim. Although not determinative, the

18

Court is also concerned with the manner in which this claim was alleged in the first instance, that is, on a slip-sheeted paper clearly in handwriting not the Plaintiff's. [See Doc. 1 at 8].

As to the retaliation claim against Defendant Geouge based on the alleged May 1, 2024 sledgehammer incident, the forecast of evidence shows only that Plaintiff was threatened by a sledgehammer wielding Geouge on April 8, 2024 "consistent with the … reopening of [the] PREA investigation" on Defendant Wilson. This conclusory forecast of evidence is plainly insufficient to survive summary judgment. Tom, 980 F.3d at 1037; Thompson Everett, 57 F.3d at 1323. Moreover, no reasonable juror could conclude from this forecast that there was a causal connection between Defendant Geouge carrying a sledgehammer and the reopening of a PREA grievance against Defendant Wilson. The Court, therefore, will grant Defendants' motion on this claim.

The Court will also dismiss Plaintiff's retaliation claim against Defendant Geouge based on the alleged use of force. As noted, the forecast of evidence shows that Defendant Geouge's use of force on the Plaintiff was an objectively reasonable response to the circumstances at hand. There is no forecast of evidence that such use of force was motivated, at least in part, by the Plaintiff's protected conduct. Moreover, Plaintiff's allegation that Defendant Geouge paraded him around the Day Room proclaiming "[t]his is what happens to pod bosses" belies Plaintiff's claim that the force used was in retaliation for Plaintiff's filing this lawsuit. Additionally, as with Plaintiff's excessive force claim, the details underlying Plaintiff's retaliation claims have changed during this litigation.

For these reasons, the Court will grant Defendants' summary judgment motion as to Plaintiff's retaliation claims against Defendants Johnson and Geouge.

### D.    Assault and Battery

"The elements of assault are intent, offer of injury, reasonable apprehension, apparent ability, and imminent threat of injury." Hawkins v. Hawkins, 400 S.E.2d 472, 475 (N.C. Ct. App. 1991), aff'd, 417 S.E.2d 447 (N.C. 1992). "A battery is made out when the person of the plaintiff is offensively touched against his will[.]" Ormond v. Crampton, 191 S.E.2d 405, 410 (N.C. Ct. App. 1972). From the forecast of evidence here, a reasonable jury might conclude that Plaintiff was technically offensively touched against his will in that Defendant Wilson likely made contact with Plaintiff's genitalia in the course of the subject search.

Defendant Wilson, a Detective with the Yancey County Sheriff's Office, contends that he is entitled to public official immunity as to Plaintiff's state law claim. [Doc. 49 at 7-8]. Under North Carolina law, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984); see also Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Grad, 312 N.C. at 313, 321 S.E.2d at 890-91.

There is no acceptable forecast of evidence that Defendant Wilson acted maliciously, corruptly, or outside the scope of his official authority, and the Fourth Amendment § 1983 claim

20

was dismissed. The Plaintiff's claim of North Carolina assault and battery fails for the same reasons. The Defendants' motion for summary judgment is, therefore, granted as to the Plaintiff's North Carolina assault and battery claim.

## IV.    CONCLUSION

For the reasons stated herein, the Plaintiff's "Dispositive Motion" is denied, and Defendants' Motion for Summary Judgment is granted.

<u>**ORDER**</u>

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment [Doc. 48] is **GRANTED** and Plaintiff's Dispositive Motion [Doc. 43] is **DENIED**.

The Clerk is respectfully instructed to terminate this action.

**IT IS SO ORDERED.**

Signed: August 27, 2025

Graham C. Mullen
United States District Judge

21